UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MEDICI CLASSICS PRODUCTIONS LLC,

                      Plaintiff,                07 Civ. 9938 (RJH)

      - against -

MEDICI GROUP LLC, et al.,

                    Defendants.

**MEMORANDUM
OPINION & ORDER**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      Plaintiff Medici Classics Productions LLC ("Medici Classics") seeks a preliminary injunction to protect its registered trademark, "Medici Classics Productions," from alleged infringement by defendant Naxos of America, Inc. ("Naxos"). Naxos is the U.S. distributor of CDs and DVDs produced by co-defendants Medici Group LLC and its affiliates (collectively, the "Medici Group") and bearing the marks "Medici Arts" and "Medici Masters." For the reasons set forth below, the Court finds that plaintiff has failed to satisfy the prevailing standards for issuance of a preliminary injunction and, therefore, that its motion should be denied.

BACKGROUND

      Plaintiff is a small recording company that was formed by its principal, Jerome Rose, in 2003 to record and release his piano performances of various classical pieces. Declaration of Jerome Rose dated June 2, 2008 ("Rose Dec."), ¶ 10. Until 2002, Rose, a well-known concert pianist and a professor of music at the Mannes College of Music,

released his recordings through various unaffiliated production companies including Vox, SPJ Music and Newport Classic.  (Transcript of Hearing dated October 23, 2008 ("Tr. I") at 8-9.  Due to adverse developments in the music industry, Rose began his own record label, Monarch Classic Productions in 2002 (Tr. I at 10).  He thereafter learned of the existence of another record company, "Monarch Records" that produced country western music, and to avoid any unpleasantness formed Medici Classics Productions in its stead.  (Tr. I at 15-17.)  A trademark registration filing for Medici Classics Productions was made in 2004 but lapsed; the application was refiled in 2008 and the mark was issued on January 22, 2008.  (Transcript of Hearing dated October 30, 2008 ("Tr. II") at 2-3.

Since January 2003 plaintiff has sold under the Medici Classics mark 494 copies of five CD recordings by Mr. Rose and 335 copies of two DVD performance for gross revenues of approximately $7,000.  Affidavit of Daniel J. Kornstein dated September 29, 2008 ("Korenstein Aff."), Ex. I.  During this period, Mr. Rose has continued to sell his inventory of recordings on the Monarch Classics label.[1]

In or around June of 2007 Mr. Rose first became aware of the Medici Group and their use of allegedly infringing marks through a phone call from a self-described producer of "Medici Masters" CDs.  Rose Dec. ¶21.  On August 3, 2007, Rose received an e-mail from defendant EuroArts Medien GmbH's general counsel inquiring whether he had "any objection" to their use of the marks "Medici Masters" and "MediciArts."  He did.  Discussions between the parties' counsel followed.  Id. ¶ 22-32.  They were unsuccessful and plaintiff filed suit on November 9, 2007.

---

[1] Plaintiff's counsel stated that between 2003 and 2008 Mr. Rose's distributor, Qualitron, sold roughly 800 DVDs and between 1,000 to 2,000 CDs on both the Monarch and Medici labels.  (Tr. 13-15.)  It appears, therefore, that during this period more of Mr. Rose's recordings were actually sold under the Monarch label then under the Medici label.

The Medici Group defendants produce and market CDs, DVDs, documentary films and audiovisual content for broadcast over the internet.  Declaration of Bernd Hellthaler dated September 26, 2008 ("Hellthaler Dec.") ¶¶ 6-12; Declaration of John Pattrick dated September 26, 2008 ("Pattrick Dec.") ¶ 3-9; Declaration of Hervé Boissière dated September 26, 2008 ("Boissière Dec.") ¶ 15-26.  They release a relative broad range of orchestral music; chamber music and ballets including archived recordings by renowned artists such as Toscanini, Rostropovich and Bernstein.  They do not, however, release recordings by Jerome Rose.  The Medici Group began distributing CDs and DVDs bearing the marks Medici Masters, Medici Arts and medici.tv in the U.S. in early 2007.  Defendant Naxos is the U.S. distributor of these recordings.  In the past 18 months Naxos has sold approximately 42,000 DVDs and 20,000 CDs bearing the allegedly infringing marks.

## DISCUSSION

To obtain preliminary relief against Naxos,[2] plaintiff must make the familiar showing of (1) irreparable harm and (2) either (a) a likelihood of success on the events or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward plaintiff.  *Brennan's Inc. v. Brennan's Resaurant, LLC*, 360 F.3d 125, 129 (2d Cir. 2004).  In a trademark infringement action, proof of a likelihood of confusion between defendants' and plaintiff's products establishes both a likelihood of success on the merits and irreparable harm.  *Id.*

---

[2] Plaintiff seeks an injunction only against Naxos for the simple reason that, given its U.S. presence, there are no contested jurisdictional issues regarding Naxos as is the case with certain of the Medici Group defendants.

In order to determine if there is a "likelihood of confusion," courts look to the *Polaroid* factors which include:  (1) the strength of the mark; (2) the degree of similarity between the two marks; (3) the competitive proximity of the products; (4) the likelihood that the prior owner will bridge the gap between the products; (5) actual confusion; (6) the defendant's good faith in adopting its own mark; (7) the quality of defendant's product; and (8) the sophistication of the buyers.  *Polaroid Corp. v. Polarad Electronics Corp.*, 297 F.2d 492, 495 (2d Cir. 1961).  Each *Polaroid* factor must be considered in the context of the other factors, and no single factor is dispositive of the likelihood of confusion.  *See Nikon, Inc. v. Ikon Corp.*, 803 F.Supp. 910, 915 (S.D.N.Y. 1992).  Additionally, all factors "must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the product."  *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 872 (2d Cir. 1986).

1.     <u>Strength of the mark</u>.

Turning to the first factor, the strength of the trademark "refers to its ability to identify the source of the goods being sold under its aegis."  *Brennan's Inc.*, 360 F.3d at 130.  "There are two components of a mark's strength:  its inherent distinctiveness and the distinctiveness it has acquired in the marketplace."  *Id.* at 130-31.  "[C]ourts classify a mark in one of four categories in increasing order of inherent distinctiveness:  generic, descriptive, suggestive and arbitrary."  *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 744 (2d Cir. 1998).  Distinctiveness in the marketplace turns on the recognition of the plaintiffs' mark in the relevant marketplace.  *See Brennan's Inc.*, 360 F.3d at 132.

Regarding inherent distinctiveness, Medici Classics is properly categorized as a "suggestive" mark as the mark is not directly descriptive but suggests a quality or

qualities of the product—here the suggestion of the Renaissance and patrons of the fine arts—that requires the use of "imagination, thought and perception." *Star Industries v. Bacardi & Co.*, 412 F.3d 373, 384-85 (2d Cir. 2005).

Suggestiveness, however, does not necessarily determine the strength of a mark, and the court must *still* consider distinctiveness in the marketplace. *Sunenblick v. Harrell*, 895 F.Supp. 616, 626 (S.D.N.Y. 1995) aff'd 101 F.3d 684 (2d Cir. 1996). In evaluating distinctiveness in the marketplace, courts examine whether the mark has gained a secondary meaning. The Second Circuit has enumerated six factors that are considered when evaluating secondary meaning: (1) the senior user's advertising and promotional expenses; (2) consumer studies linking the name to the source; (3) the senior user's sales success; (4) third-party uses and attempts to plagiarize the mark; (5) length and exclusivity of the mark's use; and (6) unsolicited media coverage of the products at issue. *Thompson Medical*, 753 F.2d at 217.

In the present case, these factors do not weigh in favor of a determination that plaintiffs' mark has gained distinction in the marketplace. Plaintiffs' advertising and promotional expenses are modest totaling at most $5,000 a year from 2003 to 2008. Moreover, some of this expense was for promoting plaintiff's Monarch Classics label, the predecessor of Medici Classics. (Kornstein Dec. Ex. J.) Plaintiff offers no consumer studies linking the "Medici Classics" mark to his performances in the minds of consumers. Plaintiff's sales are *de minimus*, slightly less than $7,000 over 5 years. (Korenstein Dec. Ex. I.) There is no evidence of any attempts by third parties to plagiarize plaintiff's mark; indeed the term "Medici" was used by others in the music world before plaintiff. (D. Mem. p. 17, ¶ 4) Plaintiff has used the mark since 2003 but

continues to distribute Mr. Rose's work using a competing trademark "Monarch Classics." (Korenstein Aff. Ex. D.) And, finally, while Mr. Rose's work has been highly praised in the past, neither the length of use of the mark nor the unsolicited reviews which mention the mark appear to be particularly probative of Medici Classics' secondary meaning.

Considering all the above factors, the Court concludes that plaintiff has not shown that the "Medici Classics" trademark has generated a secondary meaning. Consequently, plaintiff's mark is weak. *See Strange Music, Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481 (SDNY 2004).

2.      Similarity.

The degree of similarity between the marks turns on the answers to "two key questions:  (1) whether the similarity between the two marks is likely to cause confusion and (2) what effect the similarity has upon prospective purchasers.  In deciding whether the marks are similar as used, [a court does] not look just at the typewritten and aural similarity of the marks, but how they are presented in the marketplace." *The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 962 (2d Cir. 1996) (citation omitted).  There is one obvious similarity between plaintiff's and defendants' marks in that they both employ the word "Medici."  However, this factor does not necessarily make the marks similar for purposes of assessing confusion under a *Polaroid* analysis. *See*, *Sly Magazine, LLC v. Weider Publications LLC*, 529 F.Supp. 2d 425 (viewed in context, use of italicized script differentiated plaintiff and defendant; common mark); and *Brockmeyer v. Hearst Corp.*, 248 F.Supp. 2d ___, 296 (differences in cover layouts, photos and legends differentiated Oprah Winfrey's "O" magazine from similarly-named

magazine promoting sadomasochism).  As in *Sly* and *Brockmeyer*, there are notable differences between plaintiff and defendants' marks extending beyond the obvious difference in wording.  Plaintiff's mark is displayed next to a drawing of a griffin and is presented in all upper case and in white type on a black background.  Defendant's mark is presented in lower case, black type on a white background—there is a distinctive red arc above the lettering.  The marks, copies of which are appended to this opinion, create a vastly different impression on the viewer leading the Court to conclude that prospective purchasers would be highly unlikely.

3.     Proximity

    Proximity in the marketplace addresses the extent to which the parties' products compete with each other.  *Real News Project, Inc. v. Independent World Television, Inc.*, 08 Civ. 4322, 2008 WL 229830 (SDNY May 27, 2008).  In the present case, there is clearly some competitive overlap as plaintiff and defendants both sell CDs and DVDs in the classical music genre.  However, plaintiff is in a highly specialize submarket distributing under its trademark the work of a single performer, Jerome Rose, engaged principally in solo performance.  The defendants on the other hand offer a wide spectrum of classic and current great artists, excluding Jerome Rose.  Given these differences, the decision by Judge Lynch in *Real News Project, Inc.*.  Both plaintiff's "The Real News Project" and defendants' "The Real News Network" were news websites offering subscription-free alternative news services.  Their actual products differed, however, in that plaintiff's site featured investigative, analytical pieces while defendant's site focused on daily breaking news.  Because the products were so distinct, and targeted different audiences, the existence of some competitive proximity was "tempered" and did not

strongly favor plaintiff.  *Id.* at *16 (citing Cadbury Beverages, 73 F.3d _____, 480.

So too, in the present case, where both parties offer classical recordings but plaintiff's

product is so uniquely circumscribed that the risk of confusion is materially lessened.

4.     Bridging the Gap

"Bridging the gap refers to the senior user's interest in preserving avenues of

expansion and entering into related fields."  *Hormel Food Corp. v Jim Henson*

*Productions, Inc.*, 73 F.3d 497, 504 (2d Cir. 1996) (quotations and citations omitted).

This factor involves a determination of the likelihood that the plaintiff will enter the *493

defendants' business and that prospective customers are aware of this intention.  Strange

Music Inc., 326 F.Supp.2d at 492-93.

Plaintiff has not taken any actions that would evidence an intent to expand the

Medici Classics label beyond the present distribution of Jerome Rose's performances.

Nor is there any evidence that plaintiff has the financial wherewithal to do so.  The sole

piece of evidence proffered by plaintiff that pre-dates the preliminary injunction hearing

is the musings of Mr. Rose reported in a 2003 article written at the time of his launch of

Monarch Classics wherein he states that he would like to record other artists.  On this

meager record, the Court is not persuaded that Mr. Rose has the present intent to do so, or

indeed, that his 2003 comment was anything other than rosy speculation as to the

possible future of prior and (largely) abandoned label.[3]

5.     Actual Confusion.

While "actual confusion need not be shown to prevail," *Lois Sportswear U.S.A.,*

*Inc. v. Levi Strauss & Co.*, 799 F.2d 967, 875 (2d Cir. 1986), evidence of actual

---

[3] To the degree that the parties recordings are in competitive proximity "there is really no gap to bridge"
and this factor is "neutral" in the *Polaroid* analysis, *Real News Project*, *Id.* at *17 (quoting *Star Indus.*).

confusion is "highly probative" of the likelihood of confusion, *Sunenblick v. Harrell*, 895 F.Supp. 616, 630 (S.D.N.Y. 1995). Proof of actual confusion is generally shown through consumer surveys or anecdotal evidence of confusion. However, the "absence of surveys is evidence that actual confusion cannot be shown," *Sports Authority, Inc.* 89 F.3d at 964, and while anecdotal evidence may in some cases be sufficient, the evidence must be more than *de minimus*. *Real News Project, Inc.*, 2008 WL 2229830 at *17.

Plaintiff offers neither market surveys nor anecdotal evidence that a single consumer has ever purchased a CD or DVD released under defendants' labels believing that it was recorded and released by plaintiff. Given the fact that plaintiff releases only performances by Mr. Rose, the absence of actual confusion is not unexpected.

Plaintiff does point to some possible confusion in the marketplace evidenced, for example, by the fact that *Gramaphone* magazine, a highly respected publication, mistakenly identified two of defendants' recordings as being released on plaintiff's label. As the Second Circuit has noted, however, "trade-mark infringement protects only against mistaken purchasing decisions and not against confusion generally." Lang, 949 F.2d at 582-83. Equally unimpressive is evidence proffered by plaintiff that a friend of Mr. Rose sent him an e-mail stating "I see that Naxos distributes Medici. Is that yours?" "[I]nquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion as such inquiries are arguably premised upon a lack of confusion between the products such as to inspire the inquiry itself." *Nora Bevs v. Perrier Group of Am.*, 289 F.3d 114, 124 (2d Cir. 2001). To show actual confusion, a plaintiff must demonstrate "a diversion of sales, damage to goodwill, or loss of control

over reputation." *Sports Authority*, 89 F.3d at 963.  Plaintiff has failed to show any

likelihood of doing so.

6.    Bad Faith

Bad faith "generally refers to an attempt to exploit the goodwill and reputation of

a senior user by adopting the mark with the intent to sow confusion between two

companies' products. *Star Indus.* 412 F.3d at 388 (citation omitted).  There is no

evidence before the Court that defendants adopted their Medici marks with such intent.

According to Bernd Hellthaler, development of the Medici Arts and Medici Classics

brands began in January 2007 with the first Medici Arts CD release in February 2007 and

the development of a Medici Arts web platform in March 2007.  There was no attempt to

capitalize on Mr.Rose's or his company's goodwill or reputation for the simple reason

that defendants were then unaware of plaintiff's label.  (Hellthaler Dec. ¶25).  The record

is unclear as to whether defendants undertook a trademark search or consulted with

counsel prior to employing its marks.  (Tr. II at 8,11)  While it is always more prudent to

conduct a careful trademark search before adopting a mark, the failure to do so does not

necessarily evidence bad faith.  *Sunenblick*, 895 F. Supp. At 632.  Plaintiff's main

argument, in any event, appears to be that defendants continued to use the contested

marks after receiving a cease and desert letter, not that they acted with malicious intent at

the time of adoption.  (Tr. II at 5.)  This argument misses the mark, however, as it has

long been held that "[d]efendants persistence in their use of the design after notice proves

little or nothing against them."  *Strange Music*, 326 F.Supp. 2d at 494 (quoting *Straus v.*

*Notaseme Housing Co.*, 240 US 179, 181-82 (1916).  Put another way, "stubborn

insistence" on using a mark one believes it is lawfully entitled to use does not constitute

bad faith. *Real News Project, Inc.*, 2008 WL 2229830 at *21. On the present record, the Court professionally accepts defendants' explanation that they adopted the Medici Arts and Media Masters marks for creative reasons unrelated to plaintiff's use of Medici Classics and continued to use the marks with a belief that such use was reasonable. (See Hellthaler Dec. ¶¶25-35.)

7. <u>Quality of the Products</u>.

This factor "is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the juror user's product is of inferior quality." *Star Indus.*, 412 F.3d at 389 (citation and internal quotation marks omitted). While plaintiff bemoans the lack of control over defendants products (Pl. Br. at 9), it does not seriously argue that defendants products are inferior. To the Court's untutored ear the parties' labels are both of the highest artistic standards.

8. <u>Sophistication of Buyers</u>

"[T]he likelihood of confusion between the products at issue depends in part on the sophistication of the relevant purchasers." *Cadbury Beverages*, 73 F.3d at 480 (citation and internal quotation marks omitted.) In general, "[t]he more sophisticated the consumer, the less likely they are to be misled by similarity in marks." TCPIP Holding, 244 F.3d at 102. Sophistication may be proved "by direct evidence such as expert opinions or surveys, and in some cases by indirect evidence such as by inferring characteristics of consumers based on the nature of the product or its price. *Real News Project, Inc.*, 2008 WL 2229830 at *21.

Although not opining directly as to the level of sophistication, Nexos' Sean Hickey testified that a record label is not a significant factor to consumers who make

purchasing decisions based on the identity of the artist and the composition.  (Tr. 63-62).

Court's have reached similar conclusions in other music industry trademark litigation.  In

dismissing infringement claims relating to two record labels with the identical name

("Uptown Records"), the court in *Sunenblick* observed:

> Recalling once more that the relevant inquiry under Polaroid is
> whether a given factor sheds light on the likelihood of confusion,
> the court agrees with defendants that buyers of musical recordings
> are relatively sophisticated consumers whose purchasing decisions
> are driven by a recognition of and search for a particular artist or
> composition, and whose awareness of the record label—if such
> awareness even exists at the time of purchase—is at best a
> peripheral concern compared to the contents of the recording. . .
> The notion that customers typically enter a record store with the
> request 'Please show me the RCA records' . . . is simply counter-
> intuitive.

*Sunsenblick*, 895 F.Supp. at 634.

As for shoppers on the internet, they are likely to be even more discerning as they

tend to shop with a specific product in mind—say, a particular piano piece by Jerome

Rose—as opposed to shopping generically for classical music.  *Strange Music, Inc.*, 326

F.Supp.2d at 495-96.  The result of web searches performed by defendants in the present

case confirms that works by Mr. Rose distributed by Medici Classics Productions, LLC

are easily identified on the internet.  (Tr., October 30, 2008 at 30-31; Def. Ex. A and B).

There seems little risk then that the typically well-informed purchaser will buy a world

purchase, say, a Rostropovich recording released by defendants believing that it was

issued by Mr. Rose's company (or, for that matter, that any such theoretical

misidentification would be a factor in the customer's selection).

*         *         *

12

company (or, for that matter, that any such theoretical misidentification would be a factor in the customer's selection).

\*   \*   \*

Considering all the relevant *Polaroid* factors, the Court concludes that plaintiff has failed to show a likelihood of confusion sufficient to support a preliminary injunction under either prong of the applicable standard. None of the parties' trademarks are particularly strong and plaintiff's is by far the weaker due to *de minimus* promotion and sales. While there is some competitive proximity, the importance of this factor is lessened by the highly specialized nature of plaintiff's product and the absence of any meaningful evidence of an intent or ability to bridge the gap. The possibility of confusion is further decreased by the sophistication of purchasers who make decisions based on either the identity of the artist or the composition and who, in any event, are perfectly capable of distinguishing between the parties' graphically distinct logos. Finally, the Court does not find that defendants acted in bad faith by selecting these marks in an attempt to capitalize on plaintiff's reputation or goodwill.

Accordingly, plaintiff's motion for a preliminary injunction **[49]** is denied.

SO ORDERED.

Dated: New York, New York
       December **19**, 2008

Richard J. Holwell
United States District Judge

13

**APPENDIX OF MARKS**



Plaintiff's Medici Classics' logo.
Source: Defs.' Mem. of Law in Supp. of
Mot. to Dismiss, at 22 (Sept. 19, 2008).



Defendants' Medici Arts logo.
Source: Defs.' Mem. of Law in Supp. of
Mot. to Dismiss, at 22 (Sept. 19, 2008).

medici MASTERS

Defendants' Medici Masters' logo.
Source: mediciarts.co.uk (visited Dec. 19, 2008).

14